Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>V.<br><br>EDGARDO RODRÍGUEZ GONZÁLEZ<br><br>Apelante | KLAN202300387 | Apelación procedente del Tribunal de Primera Instancia Sala de Superior de Mayagüez<br><br>Caso Núm.: ISCR201102180 AL 2184<br><br>Sobre: Art. 106 CP (2 cargos), Art. 5.04 LA y Art. 5.05 Ley 404-2000 |

Panel integrado por su presidente, el Juez Rodríguez Casillas, la Jueza Mateu Meléndez y el Juez Marrero Guerrero

Marrero Guerrero, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de diciembre de 2023.

Comparece el señor Edgardo Rodríguez González (en adelante, el apelante o señor Rodríguez González), y solicita que revoquemos varias Sentencias emitidas en su contra luego de que el 12 de septiembre de 2013 el Tribunal de Primera Instancia, Sala Superior de Mayagüez (en adelante, TPI o foro primario) anunciara su fallo de culpabilidad por dos delitos de asesinato en primer grado y tres infracciones a la Ley de Armas.

En base a dicho fallo, el 19 de septiembre de 2013 el TPI dictó sus Sentencias en contra del apelante. Como consecuencia de las mismas, le impuso al señor Rodríguez González una pena de noventa y nueve (99) años de cárcel, concurrentes entre sí, por cada uno de los dos (2) cargos que enfrentaba por infracción al Artículo 106 del derogado Código Penal de 2004 (en adelante, Código Penal)[1]

---

[1] El Artículo 106 del Código Penal, 33 LPRA § 4733, disponía lo siguiente:

Constituye asesinato en primer grado:
(a) Todo asesinato perpetrado por medio de veneno, acecho o tortura, o con premeditación.

en los casos ISCR201102180 al ISCR201102181; veinte (20) años de cárcel[2] por violación al Artículo 5.04 de la derogada Ley de Armas, Ley Núm. 404-2000 (en adelante, Ley de Armas)[3], según enmendada, en el caso ISCR201102182; y veinte (20) años de reclusión[4] por cada uno de los dos (2) cargos que enfrentaba por infracción al Artículo 5.15 de la Ley de Armas[5] en los casos ISCR20110183 al ISCR20110184. El total de la sentencia impuesta fue de ciento treinta y nueve (139) años de reclusión.

Posteriormente, el **14 de abril de 2023**, el foro primario resentenció al apelante tras evaluar una solicitud al amparo de la Regla 192.1 de Procedimiento Criminal. Ante esto, se reinstaló el derecho de apelar del señor Rodríguez González.

---

[...]

[2] En esencia, la pena impuesta fue de diez (10) años, pero se duplicó de acuerdo con lo establecido en el Artículo 7.03 de la Ley de Armas.

[3] El Artículo 5.01 de la Ley de Armas, 25 LPRA § 458, prohibía la fabricación, importación venta y distribución de armas. Dispone el referido Artículo:

> Se necesitará una licencia expedida conforme a los requisitos exigidos por esta Ley para fabricar, importar, ofrecer, vender o tener para la venta, alquilar o traspasar cualquier arma de fuego, municiones o aquella parte o pieza de un arma de fuego donde el fabricante de la misma coloca el número de serie del arma. Toda infracción a este Artículo constituirá delito grave y será sancionada con pena de reclusión por un término fijo de quince (15) años, sin derecho a sentencia suspendida, a salir en libertad bajo palabra, o a disfrutar de los beneficios de algún programa de desvío, bonificaciones o alternativa a la reclusión reconocida en esta jurisdicción, debiendo cumplir en años naturales la totalidad de la pena impuesta. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinticinco (25) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de diez (10) años.

[4] En efecto, la pena impuesta fue de cinco (5) años de reclusión para cada uno de los cargos, pero se duplicó por mediar circunstancias agravantes de conformidad con el Artículo 5.15 de la Ley de Armas, 25 LPRA § 458n. Particularmente, dicho artículo establecía que "… [l]a pena de reclusión… será por un término fijo de cinco (5) años. De mediar circunstancias agravantes, la pena establecida podrá ser aumentada hasta un máximo de diez (10) años…" Por ello, el total de la pena impuesta para estos dos cargos fue de veinte (20) años de cárcel.

[5] El Artículo 5.15 de la Ley de Armas, 25 LPRA § 458n prohibía apuntar a una persona con un arma de fuego o disparar un arma en cualquier sitio. Específicamente, el Artículo 5.15 establecía lo siguiente:

> (A) Incurrirá en delito grave toda persona que, salvo en casos de defensa propia o de terceros o de actuaciones en el desempeño de funciones oficiales o de actividades legítimas de deportes, incluida la caza, o del ejercicio de la práctica de tiro en un club de tiro autorizado: (1) voluntariamente dispare cualquier arma en un sitio público o en cualquier otro sitio, aunque no le cause daño a persona alguna, o (2) intencionalmente, aunque sin malicia, apunte hacia alguna persona con un arma, aunque no le cause daño a persona alguna…

Examinemos el trasfondo procesal y fáctico del caso ante nuestra consideración.

**I**

Por hechos ocurridos el 15 de agosto de 2010, el Ministerio Público presentó cinco (5) denuncias en contra del señor Rodríguez González por infringir el citado Artículo 106 del Código Penal, *supra,* y los Artículos 5.04 y 5.15 de la Ley de Armas, *supra.* Luego de varios trámites procesales, el juicio en contra del señor Rodríguez González se celebró por Tribunal de Derecho ante la Honorable Jueza Aixa Rosado Pietri los días 28, 29, 30, 31 de mayo de 2013, así como el 12 de septiembre de 2013. En esta última fecha, el TPI halló culpable al apelante en los cinco (5) cargos presentados en su contra.

El 4 de octubre de 2022, el señor Rodríguez González presentó una solicitud al amparo de la Regla 192.1 de Procedimiento Criminal. En esta petición, argumentó que por asuntos atribuibles a la representación legal que lo representó en su proceso de juicio ante el TPI, su apelación fue radicada fuera del término jurisdiccional y por ende desestimada.[6] Con el propósito de atender los planteamientos del apelante, el 16 de febrero de 2023, el TPI celebró una vista evidenciaria. Tras la celebración de la vista, el 9 de marzo de 2023,[7] la Honorable Juez Carmen L. Montalvo Laracuente declaró ha lugar la petición al amparo de la Regla 192.1 de Procedimiento Criminal, así como también una solicitud de re-sentencia para reinstalar el derecho de apelar del señor Rodríguez González. Las nuevas Sentencias fueron dictadas el 14 de abril de 2023.

Por consiguiente, el apelante acude ante nosotros mediante el presente recurso de apelación y señala la comisión de los siguientes errores por parte del foro primario:

---

[6] *Véase*, Pueblo v. Edgardo Rodríguez González, KLAN201301678.
[7] Notificada el 14 de marzo de 2023.

1. Erró el Honorable Tribunal de Primera Instancia al emitir un fallo de culpabilidad por infracciones al Artículo 106 del Código Penal de 2004; Artículo 5.04 y 5.15 de la Ley de Armas de 404-200, aunque no fue derrotada la presunción de inocencia y no se establecieron todos los elementos del delito más allá de duda razonable.

2. Erró el Honorable Tribunal de Primera Instancia al no considerar las evidentes, claras y palpables contradicciones del testimonio y la clara motivación para declarar del único testigo de cargo, Brian Santiago, que señala al acusado y lo vincula con las acusaciones presentadas.

A la luz de que el señor Rodríguez González señala asuntos relacionados con la apreciación de la prueba, este sometió ante nosotros la transcripción de la prueba oral vertida en el juicio. Además, ambas partes presentaron sus respectivos alegatos, por lo que el recurso quedó perfeccionado.

Con el beneficio de la comparecencia de las partes, procedemos a resolver. Comenzamos exponiendo un resumen de la prueba presentada en el juicio. En esencia, la prueba testimonial del Ministerio Público consistió en los siguientes testimonios estipulados: (1) el señor Diego Aldegor Vargas, (2) el señor Carlos Rivera Pérez, (3) la señora María Hernández Miranda, (4) el señor Félix Vázquez Solis, (5) la señora Yamaira Falú Carrasquillo, (6) la señora Ana A. Torres, (7) la señora Yanitza Cuevas López, (8) la señora Carmen M. Vélez González, (9) la Doctora Rosa M. Rodríguez Castillo, (10) el Doctor Carlos Chávez Arias, (11) el Doctor Román, (12) el señor Gilberto Chaparro Echevarría, (13) el Agente José Camacho y (14) el Agente Padilla. Además de los testimonios estipulados, la prueba del Ministerio Público se basó en los testimonios vertidos por las siguientes personas: (1) el señor Brian Santiago Rivera, (2) el Agente Héctor Pérez Rojas y (3) el Agente Manuel Caraballo Vázquez. Por su parte, la defensa del señor Rodríguez González presentó el testimonio de la señora Isabel Colón Carlo.

# I
## -A-

En cuanto a los testimonios estipulados, exponemos una síntesis.

*Sr. Diego Aldegor Vargas*

Sobre el testimonio del señor Aldegor Vargas, se estipuló que este llegó al negocio en la noche de los hechos y el occiso Wilson Sánchez González se montó en su vehículo. Acto seguido, el señor Aldegor Vargas transportó al occiso Sánchez González al Centro Médico de Mayagüez. Luego de ello, abandonó el centro hospitalario.[8]

*Sr. Carlos Rivera Pérez*

Respecto al testimonio del señor Rivera Pérez, se estipuló que es un examinador de armas de fuego. Además, se estipularon los dos informes que preparó y redactó tras un análisis y estudio de los casquillos de balas encontrados en la escena.[9]

*Sra. María Hernández Miranda, Sra. Yamaira Falú Carrasquillo, Sra. Ana A. Torres, Sr. Félix Vázquez Solis y el Sr. Gilberto Chaparro Echevarría*

Se estipuló que la señora Hernández Miranda, la señora Falú Carrasquillo, la señora Torres, el señor Vázquez Solis y el señor Chaparro Echevarría eran las técnicas y los técnicos de control y custodia de evidencia del Instituto de Ciencias Forenses (ICF), y que estas personas recibieron las piezas de evidencia y mantuvieron la cadena de custodia.[10]

*Sra. Yanitza Cuevas López*

Con relación al testimonio de la señora Cuevas López, se estipuló que fue la persona que identificó el cuerpo del occiso José A. Méndez Ruiz.[11]

---

[8] Véase páginas 19-21 de la transcripción de la vista celebrada el 28 de mayo de 2013.
[9] *Id.,* a las páginas 21-22.
[10] *Id.,* a las páginas 22 y 24.
[11] *Id.,* a la página 23.

*Sra. Carmen M. Vélez González*

Acerca del testimonio de la señora Vélez González, se estipuló que fue la persona que identificó el cuerpo del occiso Sánchez González.[12]

*Dra. Rosa M. Rodríguez Castillo*

En cuanto a la Dra. Rodríguez Castillo, se estipuló el protocolo de autopsia que preparó sobre el occiso Sánchez González.[13]

*Agte. José Camacho*

Sobre el agente Camacho, se estipuló que era el agente de servicios técnicos de la Policía de Puerto Rico (PPR) que tomó las fotografías de la escena y de los cuerpos de los occisos.[14]

*Agte. Padilla*

Para efectos del testimonio del agente Padilla, se estipuló que fue el primer policía que llegó al lugar de los hechos y custodió la escena.[15]

*Dr. Román*

Respecto al testimonio del doctor Román, se estipuló que certificó la muerte del occiso Sánchez González en el Centro Médico de Mayagüez.[16]

*Dr. Carlos Chávez Arias*

En cuanto al doctor Chávez, se estipuló el protocolo de autopsia que preparó sobre el occiso Méndez Ruiz.[17]

**I**

**-B-**

Procedemos ahora con un sumario de los testimonios vertidos en el juicio en su fondo.

*Sr. Brian Santiago Rivera*

---

[12] *Id.,* a la página 25.
[13] *Id.,* a la página 24.
[14] *Id.,* a la página 25.
[15] *Id.,* a la página 26.
[16] *Id.,* a las páginas 26-27.
[17] Véase página 5 del Alegato de El Pueblo.

Como parte del examen directo, el señor Santiago Rivera declaró que tenía 28 años y que desde el 2011 estaba cumpliendo una sentencia relacionada con la Ley de Sustancias Controladas.[18] Testificó que, antes de estar confinado, residió en el residencial Candelaria del Municipio de Mayagüez. Afirmó que se dedicaba a herrar y montar caballos. Alegó conocer a Edgardo Rodríguez González por concepto de los caballos y del caserío. Añadió que lo conocía por su apodo, Prieto.[19] Lo identificó y señaló en la sala del tribunal. Luego, expresó que por concepto del caserío también conocía al señor Méndez Ruiz, a quien apodaban el Bombero.[20]

A preguntas del Ministerio Público, el señor Santiago Rivera aseguró que, para la fecha del 14 de agosto de 2010, estaba en la libre comunidad. Específicamente, declaró que, el 14 de agosto de 2010, se encontraba en Cabo Rojo en el negocio Bumper. Indicó que había ido a ese negocio un "par de veces". Describió que es un negocio de madera donde se baila y bebe. Aseveró que, llegó aproximadamente a las 8:00 o 9:00 de la noche con cuatro personas que son sus amigos y amigas.[21]

Al preguntarle si recordaba haber visto a Prieto, el testigo Santiago Rivera contestó que "había más gente por allí".[22] Acto seguido, respondió que "estaba por allí, tal vez, estaba por allí".[23] Luego, afirmó haber visto a Bombero.[24] Tras contestar estas preguntas, la Jueza Rosado Pietri interrumpió y comentó que estaba percibiendo malestar en el tono de voz del señor Santiago Rivera. Posterior a ello, le instruyó contestar las preguntas del fiscal Blondet Vissepó.

---

[18] Véase las páginas 9 y 12 de la transcripción de la vista celebrada el 29 de mayo de 2013.
[19] *Id.*, a la página 10.
[20] *Id.*, a la página 12.
[21] *Id.* a las páginas 12-15.
[22] *Id.* a la página 15.
[23] *Id.* a la página 16.
[24] *Id.*

Más adelante, el testigo sostuvo conocer a Jason también de la "calle". Luego, el Ministerio Público le preguntó si recordaba haberlo visto en el negocio la noche de los hechos. Ante esto, el testigo dijo "creo que sí".[25] Al ser cuestionado acerca del nombre de las personas con las que llegó a Bumper, el testigo se limitó a responder "amigos, amigos míos y amigas mías".

El testigo Santiago Rivera especificó que estuvo en el negocio Bumper hasta aproximadamente las 3:00 a.m.[26] Relató que, en la madrugada del 15 de agosto de 2010, ocurrió "un tiroteo entre personas".[27] Puntualizó que el tiroteo fue "entre Bombero y Prieto".[28] Manifestó que mientras ocurrió el tiroteo, él se encontraba "arriba en el negocio" y Bombero "afuera del negocio, [...] por el portón".[29] En cuanto a Prieto, subrayó que este estaba "para allá, para los carros".[30] Describió que el negocio tiene un estacionamiento en tierra. Por la misma línea, detalló que Bumper tiene un estacionamiento adentro del portón y otro estacionamiento afuera. Luego, expuso que Prieto estaba en el estacionamiento de adentro.[31]

Por consiguiente, el fiscal Blondet Vissepó le preguntó a qué distancia, aproximadamente, se encontraba de Bombero y Prieto cuando ocurrió el tiroteo. Como parte de su respuesta, el testigo Santiago Rivera dijo "acho pega'o". Sin embargo, en seguida testificó "lejitos, lejitos, porque no te vas a meter donde te vayan a dar un tiro, chico".[32]

Según declaró el testigo Santiago Rivera, Bombero se encontraba con Wilson Sánchez González, a quien también conocía

---

[25] *Id.* a la página 17.
[26] *Id.* a las páginas 17-18.
[27] *Id.* a las páginas 20-21.
[28] *Id.* a la página 21.
[29] *Id.*
[30] *Id.*
[31] *Id.* a la página 23.
[32] *Id.*

por concepto de la "calle".[33] De la misma manera, precisó que Prieto se encontraba con sus amistades y su esposa.[34]

Subsiguientemente, el señor Santiago Rivera respondió que antes del tiroteo él se encontraba dentro del negocio en la parte de arriba. Tras ser cuestionado sobre una posible situación entre Prieto y Bombero antes de que ocurriera el aludido tiroteo, el testigo expresó que "situaciones, discusiones, siempre pasan discusiones".[35] Ante ello, el fiscal Blondet Vissepó le reiteró que explicara qué situación hubo entre Prieto y Bombero. El señor Santiago Rivera indicó que "discusiones, todas las personas siempre discuten".[36] Entonces, el representante del Ministerio Público, le preguntó al testigo en qué consistió la discusión. El señor Santiago Rivera arguyó que Prieto y Bombero discutieron por "tonterías" y "problemas" y que creía que Bombero le estaba diciendo algo a "Janice", la esposa de Bombero.[37] Entonces, "Prieto escuchó" lo que Bombero le estaba diciendo a Janice y por eso "discutieron".[38] Testificó que la aludida discusión fue primero que el tiroteo.[39] Incluso, afirmó que el tiroteo fue "al rato".[40] También, resaltó que la discusión fue frente al negocio y arriba. Indicó que, luego de la discusión Prieto se fue para el negocio de nuevo y Bombero se quedó "allí", también en el negocio.[41]

El señor Santiago Rivera señaló que, en el momento del tiroteo, Bombero se encontraba en el estacionamiento frente al portón "disparando con la pistola" "a donde Prieto".[42] Expresó que Prieto se encontraba en el "parking del negocio" escondiéndose de

---

[33] *Id.* a la página 24.
[34] *Id.*
[35] *Id.* a la página 25.
[36] *Id.* a la página 27.
[37] *Id.* a las páginas 27-28.
[38] *Id.* a las páginas 28-29.
[39] *Id.* a la página 29.
[40] *Id.* a la página 30.
[41] *Id.* a las páginas 30-31.
[42] *Id.* a la página 31.

los tiros.[43] Manifestó "me escondí de los tiros y al rato se escucharon más tiros", como a un "par de minutos" después, en la misma área "allí donde estaba Bombero".[44] Describió el área como frente al "parking" al lado de la guagua verde de Bombero.[45] Explicó que él vio en esos momentos, en el área de la guagua, que "Bombero está disparándole a Prieto y Prieto y le dispara a él". Continuó detallando que Bombero estaba "pega'o para la guagua de él" y que Wilson estaba "dentro de la guagua" en el lado "del chofer".[46] Aseveró que Prieto le disparó a Bombero "en la cara" "como tres a cuatro" veces y que los tiros fueron como a 10 pies de distancia.[47] A preguntas del Ministerio Público, contestó que "como el segundo" disparo fue el que le dio en la cara a Bombero.[48] Declaró que, luego de ello, Prieto tuvo que haberse ido hacia el estacionamiento.[49]

En respuesta a la pregunta sobre qué hacía Wilson dentro del vehículo, el testigo Santiago Rivera respondió "no sé de verdad, sería esperando a Bombero".[50] Afirmó que él no le vio ningún arma de fuego a Wilson. Sostuvo que, luego de los disparos, Bombero se encontraba en el piso. Indicó que, una vez observó lo ocurrido, se fue del lugar.

El testigo Santiago Rivera narró que él se encontraba a una distancia aproximada de 30 pies de los hechos.[51] Además, dijo que estaba "como para irme [...], estaba fuera de la calle para irme. Recuerda, eso fue para allá para el "parking", ahí mismo en el "parking", entre medio [d]el portón".[52] A preguntas del fiscal Blondet Vissepó sobre cómo era la luz en el área del portón, el testigo

---

[43] *Id.* a la página 32.
[44] *Id.* a la página 33.
[45] *Id.*
[46] *Id.* a la página 34.
[47] *Id.* a las páginas 36-37.
[48] *Id.* a la página 37.
[49] *Id.* a la página 38.
[50] *Id.* a la página 40.
[51] *Id.*
[52] *Id.* a la página 41.

describió que allí hay un poste de luz.[53] Asimismo, dijo que Prieto llegó al área del portón donde estaba el carro de Bombero "por los carros".[54]

El Ministerio Público le mostró el Exhibit 2 al señor Santiago Rivera y este identificó el negocio.[55] De forma similar, cuando se le presentó el Exhibit 10, reconoció el estacionamiento de afuera y asintió que la guagua verde de Bombero se encontraba allí.[56] Al mostrarle el Exhibit 13, el testigo reconoció el estacionamiento de adentro.[57] Luego, al presentarle el Exhibit 11, señaló el sitio donde ocurrió la discusión entre Prieto y Bombero.[58] Al mostrarle el Exhibit 128, identificó la guagua de Bombero. Por último, declaró que se retiró del establecimiento con unos amigos para su casa. Con esto, concluyó el examen directo al señor Santiago Rivera.

Durante el contrainterrogatorio, el señor Santiago Rivera reiteró que estaba cumpliendo condena por un caso de sustancias controladas de 2005, con una sentencia de 6 años y 4 meses. Afirmó que ese mismo día tenía otro caso pendiente en el tribunal.[59] Aclaró que su caso estaba entonces bajo la Regla 185 del Procedimiento Criminal "para arreglar la sentencia, pero eso no tiene nada que ver aquí".[60] Además, dijo que cuando vean la moción que se presentó en su caso, todavía no queda en la libre comunidad.[61] Por otro parte, indicó que también estaba sentenciado por un caso en violación a la Ley Núm. 54-1989.

Al responder las preguntas de la Lcda. Toro Vélez, el señor Santiago Rivera indicó que la señora Merlene Agostini (Marlene) era su esposa. Hizo referencia a que conocía al apelante desde hacía 5

---

[53] *Id.*
[54] *Id.* en la página 43.
[55] *Id.* en las páginas 43-44.
[56] *Id.* en la página 45-47.
[57] *Id.* en las páginas 47-48.
[58] *Id.* en las páginas 50-51.
[59] *Id.* en la página 56.
[60] *Id.* en la página 58.
[61] *Id.* en la página 59.

años o más.[62] Señaló que, aunque Bombero no vivía en Candelaria, su esposa Janice sí residía allí. Agregó que Bombero era su amigo y que lo conocía de hace 3 años.[63]

En cuanto al 14 de agosto de 2010, el señor Santiago Rivera indicó que llegó al negocio con "gente del caserío". Afirmó que en su declaración jurada expuso que él llegó con su esposa, Marlene.[64] Añadió que "cuando pasó el revolú, ellos no estaban". Después, asintió que también llegó con "Icu y con Isabel".[65] Cuando se le preguntó si llegó con "Isabel Colón Carlo", respondió que desconocía su apellido. Afirmó que había llegado en la guagua blanca de Isabel y que él no venía de otro negocio.[66] Agregó que Icu era un amigo de ellos y no un familiar de Isabel o de él.[67] A su vez, sostuvo que Icu era su amigo y que estudiaron juntos. Recalcó que, previo al tiroteo, él había ido al establecimiento "un montón de veces". De igual forma, manifestó que el día de los hechos se tomó como cinco cervezas.[68]

Posteriormente, la Lcda. Toro Vélez le preguntó al señor Santiago Rivera sobre Jason, y este respondió que él no montaba caballos.[69] A preguntas de la abogada, el testigo también contestó que a veces visitaba al apelante en su hogar.[70] Asimismo, señaló que en la noche de los hechos no compartió con Bombero ni con Prieto.[71]

La defensa del apelante le mostró al testigo el Exhibit 3. Tras examinar la fotografía, el señor Santiago Rivera distinguió los dos estacionamientos del negocio. Particularmente, señaló "el de adentro y el de afuera".[72] Acto seguido, la abogada preguntó qué

---

[62] *Id.* en las páginas 65-66.
[63] *Id.* en las páginas 68 y 72.
[64] *Id.* en las páginas 75-76.
[65] *Id.* en la página 76.
[66] *Id.* en la página 77.
[67] *Id.* en la página 82.
[68] *Id.* en las páginas 91-92.
[69] *Id.* en la página 98.
[70] *Id.* en las páginas 102-103.
[71] *Id.* en la página 103.
[72] *Id.* en la página 108.

quería decir con que hay un "parking" adentro y otro afuera. En respuesta, el testigo aclaró que uno de esos estacionamientos es "el de afuera porque el portón divide el otro parking".[73] Luego, dijo que el estacionamiento de adentro es el que está detrás del portón.[74]

De acuerdo con el testigo Santiago Rivera, en la noche del tiroteo, el establecimiento estaba lleno.[75] Después de eso, contestó que cuando ocurrió la situación del tiroteo, él estaba "frente al negocio" "antes de entrar para [...] adentro del negocio".[76] Agregó que, había salido a coger aire y que en ese momento estaba solo.[77] Mencionó que su esposa, Isabel e Icu, se quedaron dentro del establecimiento.[78] Afirmó que saludó a Bombero, a Edgardo y a Jason la noche de los hechos.[79] Luego, dijo que Prieto y Bombero no estuvieron juntos esa noche.

Después de un receso por parte del tribunal, el señor Santiago Rivera señaló que vio a Bombero disparando hacia arriba y posteriormente agregó que fue recto.[80] Sostuvo que Bombero se encontraba "afuera al lado de la guagua", específicamente parado al lado "del conductor".[81] Enfatizó que él se encontraba "al frente del negocio" y Bombero en el estacionamiento después del portón.[82] Indicó que ese portón estaba abierto cuando Bombero estaba disparando. Expresó que después escuchó varios disparos y describió que fueron consecutivos.[83] Puntualizó que fueron "rapidito, uno detrás del otro".[84] Aludió que eso ocurrió después de las 10:00 p.m., pero no pudo precisar la hora exacta.[85]

---

[73] *Id.*
[74] *Id.* en la página 109.
[75] *Id.* en la página 115.
[76] *Id.* en las páginas 125-126.
[77] *Id.* en la página 131.
[78] *Id.* en la página 132.
[79] *Id.* en las páginas 139-140.
[80] *Id.* en la página 146.
[81] *Id.* en las páginas 146-147.
[82] *Id.* en la página 148.
[83] *Id.* en la página 150-151.
[84] *Id.*
[85] *Id.* en la página 153.

Más adelante, la jueza Rosado Pietri solicitó al señor Santiago Rivera que levantara la cabeza al contestar y este respondió: "[l]o que pasa que, de verdad, misis, cuando ya me han dicho las cosas un montón de veces, las mismas, [...] y no termina nunca" [...]. "Tratando de enredar a uno". A lo que, la jueza Rosado Pietri le indicó "[n]ecesito que me mire. Yo tengo que evaluar su declaración y yo tengo que mirar. Yo no voy a estar constantemente mirándolo, pero tengo que mirarlo. Entonces, yo no puedo evaluarlo si usted tiene la cabeza enterrada y lo que le veo es esta parte del cráneo." El señor Santiago Rivera, respondió que "entiendo". En ese momento, la jueza Rosado Pietri añadió lo siguiente: "el fiscal [...] objetara cuando él entienda que tiene que objetar, yo le voy a pedir a la licenciada que tratemos de no ser repetitivos. Ya llevamos mucho tiempo con este testigo". La jueza agregó, "[l]e voy a pedir entonces que vayamos directo a las preguntas que hay que ir y no seamos repetitivos.[86]

El señor Santiago Rivera declaró que él permaneció en el mismo lugar cuando Bombero comenzó a disparar. A preguntas de la Lcda. Toro Vélez, el testigo manifestó que él se puso nervioso tras los disparos, pero que estaba "despega'o".[87] Respondió que cuando Bombero disparó, su esposa ya se había ido del negocio y que él se quedó con un muchacho.[88] Sostuvo que antes del tiroteo hubo una discusión entre Prieto y Bombero, y reconoció que en ese momento estaba cerca de ellos.[89] Añadió que "todo pasó afuera del negocio, nada pasó dentro del negocio". Expresó que, luego de la discusión, el tiroteo ocurrió "al rato" y no pudo precisar el tiempo que pasó entre la discusión y el tiroteo.[90] Señaló que luego de la aludida discusión, Prieto entró al negocio y Bombero se quedó afuera en el

---

[86] *Id.* en la página 154-155.
[87] *Id.* en la página 156-157.
[88] *Id.* en la página 157.
[89] *Id.* en la página 159.
[90] *Id.* en la página 161.

"parking".[91] Posteriormente, indicó que Bombero bajó hasta donde estaba localizada su guagua y desde ahí disparó.[92]

Luego de varias preguntas, el testigo indicó que no recordaba la fecha en que suscribió la declaración jurada. Tras mostrársele la declaración jurada, declaró que fue el 2 de septiembre de 2010. Alegó que antes de esa fecha no le había contado a nadie lo sucedido.[93] Agregó que él no le narró a ningún policía los hechos. Indicó que, el 2 de septiembre de 2010, llegó solo y hasta caminando a fiscalía. Después de cuestionarle si llegó espontáneamente hasta fiscalía, el testigo esbozó "porque me dio la gana".[94] Asintió que, aunque percibía riesgos al contarle a la fiscalía lo ocurrido, tomó la decisión de hacerlo y luego expresó "a lo hecho, pecho".[95] Una vez más, la abogada preguntó por qué el testigo había optado por ir a la fiscalía en lugar de dirigirse directamente a un cuartel. Ante esto, el señor Santiago Rivera dijo "a uno le pasan muchas cosas por la mente de momento". Luego, expuso que desconocía la razón específica por la cual decidió acudir a fiscalía.[96]

Más adelante, el testigo recalcó que Wilson estaba dentro de la guagua de Bombero y que él no lo vio cuando se montó allí. Reiteró que luego de los disparos, Bombero quedó en el piso al lado del conductor, boca arriba, y señaló en sala en qué dirección quedó la cabeza.[97] Aludió que Bombero no quedó debajo de la guagua.[98] Afirmó que en la declaración jurada que prestó el 2 de septiembre de 2010, había dicho que Bombero estaba solo cuando le dispararon.[99] Asimismo, asintió que en la declaración juraba él contestó que desconocía donde estaba Wilson.[100] Acto seguido, la

---

[91] *Id.* en la página 165.
[92] *Id.* en la página 166.
[93] *Id.* en la página 169.
[94] *Id.* en la página 174.
[95] *Id.* en la página 175.
[96] *Id.* en la página 177.
[97] *Id.* en las páginas 188-189.
[98] *Id.* en la página 190.
[99] *Id.* en las páginas 198-199.
[100] *Id.* en la página 200.

abogada planteó las siguientes preguntas, "¿dónde está diciendo la verdad: cuando hizo la declaración jurada o aquí? ¿O cuándo está mintiendo?" El señor Santiago Rivera respondió que en la declaración jurada contestó que él desconocía donde estaba Wilson.[101]

La abogada le cuestionó al testigo que en la declaración jurada surgía que él se había ido con su esposa y una amiga, pero que ahora estaba testificando que ya ella no estaba ahí.[102] En cuanto a esto, el señor Santiago Rivera reaccionó explicando que tenía dolor de cabeza porque le tenían enredada la mente.[103] Luego, testificó que ahora está diciendo la verdad, y añadió que, tampoco mintió en la declaración jurada.[104]

Más adelante, relató que llegó a su casa alrededor de las 4:00 a.m. y se quedó en los predios del caserío.[105] Afirmó que no le comentó a nadie el incidente que tuvo lugar en Bumper.[106] Declaró que cuando Bombero se encontraba en el piso, estaba muerto.[107] Agregó que, desde "lejitos", vio el cuerpo tirado y que estaba muerto porque no se movía.[108] Respecto a Wilson, indicó que estaba dentro del vehículo, pero no pudo observar si este estaba muerto.[109] A preguntas de la abogada, el testigo manifestó que desconocía si Jason y Wilson discutieron en el negocio.[110] También se le preguntó si tenía conocimiento de que el agente Pérez Rojas se había ido detrás de Bombero, a lo que respondió que no conoce al agente y que él no lo vio.[111] De igual forma, afirmó que no vio bajar a Wilson detrás de Bombero.[112]

---

[101] *Id.* en la página 201.
[102] *Id.* en la página 206.
[103] *Id.* en la página 207.
[104] *Id.* en las páginas 208 y 210.
[105] *Id.* en la página 211.
[106] *Id.* en las páginas 213-214.
[107] *Id.* en la página 216.
[108] *Id.* en la página 219.
[109] *Id.* en las páginas 219-220.
[110] *Id.* en la página 226.
[111] *Id.* en las páginas 226-227.
[112] *Id.* en la página 228.

En el redirecto, el Ministerio Público leyó en voz alta la última oración de la penúltima pregunta de la declaración jurada "¿con quién se encontraba Bombero cuando fue tiroteado por Prieto?". Luego de leer la pregunta, el fiscal Blondet Vissepó le preguntó al testigo sobre su respuesta a esa pregunta en la declaración jurada. El testigo respondió que su respuesta había sido la siguiente "con Wilson".[113]

En el recontrainterrogatorio, el testigo sostuvo que en la declaración jurada se le hicieron dos preguntas distintas: "¿con quién estaba Bombero cuando le dispararon?" y "¿con quién se encontraba cuando fue tiroteado por Prieto?". Luego agregó, "no es la misma" pregunta.[114]

Finalmente, las partes estipularon la admisión como Exhibit de la declaración jurada del señor Santiago Rivera, y así culminó su testimonio.

*Agte. Héctor Pérez Rojas*

El agente Pérez Rojas testificó que trabajaba en la Policía de Puerto Rico desde 17 a 18 años.[115] Detalló que, en la noche del 14 de agosto de 2010, se encontraba compartiendo en el negocio Bumper.[116] Describió que el lugar es en madera y cuenta con cocina, apartamento, piscina y estacionamiento adentro y afuera.[117] Mencionó que esos estacionamientos están en tierra y los divide una verja en tablas.[118] También dijo que el negocio era tipo "pub". Subrayó que para ese tiempo y en ese tipo de negocios, trabajaba como guardía de seguridad, lo que se conoce como "bouncer". Detalló que tenía alrededor de un año trabajando en Bumper como

---

[113] *Id.* en las páginas 233-234.
[114] *Id.* en la página 236.
[115] Véase la página 5 de la transcripción de la vista celebrada el 30 de mayo de 2023.
[116] *Id.* en las páginas 5-7.
[117] *Id.* en la página 6.
[118] *Id.* en las páginas 6-7.

guardia de seguridad. Sin embargo, afirmó que el día de los hechos no estaba trabajando en el negocio.[119]

El agente Pérez Rojas, manifestó que llegó al lugar de los hechos a las 11:00 p.m. Testificó que entre las 3:10 y las 3:15 de la madrugada, el día 15 de agosto de 2010, él se encontraba "en una de las puertas que da para el pasillo de la parte de atrás".[120] Describió que el establecimiento "tiene un balcón a la vuelta redonda" y que él "estaba en una de las partes" del "pasillo".[121] Desde esa posición, notó "una discusión entre un joven y una muchacha".[122] Cuando el Ministerio Público le preguntó sobre el nombre del joven involucrado en la discusión, indicó que en el negocio se referían a él como Jason.[123] Luego, detalló "había una situación entre ellos que me llamó la atención porque él le daba en la cien suave, no era que la agredía, pero le estaba dando en la cien y le hablaba bien cerca".[124] Agregó, "noté también que [...] hablaba él con ella, después venía otro joven [y] hablaba con ella, volvía este [...] muchacho, Jason, [ha] hablar con ella. En una de las que Jason se retira, esta otra persona que lo llamaron allí como Wilson, le dijo algo y ellos se enredaron".[125] Aclaró que Wilson le dijo algo a Jason y entonces "ellos se enredaron [...]".[126] Agregó que él y otras personas intervinieron y los separaron. Dijo que Jason salió del local por la entrada principal.[127] Declaró que le informó a Wilson que tenía que abandonar el lugar y Wilson le contestó que "tenía un poco de miedo, que le diera break en lo que [...] Jason se marchaba".[128]

---

[119] *Id.* en la página 8.
[120] *Id.* en la página 9.
[121] *Id.*
[122] *Id.* en la página 10.
[123] *Id.*
[124] *Id.*
[125] *Id.* en las páginas 10-11.
[126] *Id.* en la página 11.
[127] *Id.* en la página 11.
[128] *Id.* en la página 12.

Acto seguido, le dijo a Wilson que por lo menos saliera del local y se quedara en la parte de arriba, en lo que Jason se marchaba.[129]

El testigo Pérez Rojas explicó que, acompañó a Wilson a abandonar el local. En ese transcurso, Wilson le preguntó a muchas personas por Bombero y estas respondieron no saber dónde estaba.[130] Precisó que salieron del local y permanecieron cerca de la entrada principal para estar pendiente a Jason.[131] Indicó que mientras permanecían cerca de la entrada principal, a sus espaldas se formó una discusión.[132] Aclaró que cuando se viró, vio que Bombero le lanzó una lata de cerveza a un joven.[133] Describió que el joven salió corriendo hacia la parte de abajo del estacionamiento que está ubicado dentro de los predios del lugar. Ante esto, Bombero le dijo al joven "¿tú vas a buscar tu arma?, pues yo voy a buscar la mía".[134] El agente Pérez Rojas testificó que Bombero también salió corriendo hasta el segundo estacionamiento de afuera y que él se fue detrás de Bombero para cerrar el portón. Expresó que Wilson también se fue corriendo en dirección hacia Bombero.[135] Añadió que vio cuando Bombero llegó hasta su vehículo que estaba cerca del portón, sacó un arma de fuego y se la colocó en su cintura.[136] Destacó que Bombero caminó hacia el portón, se mantuvo ahí y profirió palabras soeces.[137] A preguntas del Ministerio Público, afirmó haber visto a Jason, Wilson y Bombero anteriormente, ya que estos frecuentaban el lugar, así como otros "pubs".[138] Manifestó que Bombero esbozó palabras soeces contra el aludido joven y "habló de una fémina que estaba allí al lado del portón".[139]

---

[129] *Id.* en la página 12.
[130] *Id.* en la página 13.
[131] *Id.* en las páginas 13-14.
[132] *Id.* en la página 14.
[133] *Id.* en las páginas 14-15.
[134] *Id.* en la página 15.
[135] *Id.*
[136] *Id.* en las páginas 15-16.
[137] *Id.* en la página 17.
[138] *Id.* en las páginas 17-18.
[139] *Id.* en la página 21.

Durante el interrogatorio del fiscal Blondet Vissepó, el agente Pérez Rojas afirmó tener conocimiento sobre la identidad de Edgardo Rodríguez González, conocido por Prieto. Luego, lo identificó en la sala del tribunal y expresó haberlo visto el día de los hechos.[140] Agregó que lo vio en el bullicio compartiendo con algunas personas.[141] No obstante, indicó que no lo vio compartiendo con Jason, Wilson y Bombero.[142]

Respecto a los hechos que nos ocupan, el testigo continuó respondiendo que Bombero estaba haciendo unas manifestaciones hacia "al joven que corrió y a una dama que estaba ahí".[143] Sostuvo que mientras Bombero estaba gritando y amenazando, él pensó que podía estar en un fuego cruzado, por lo que subió la cuesta embreada del negocio.[144] Mientras subía la cuesta, escuchó "dos detonaciones" "no seguidas" y que cuando miró, vio a "Bombero con el arma en la mano" "frente al portón afuera".[145] Luego, expresó que cuando llegó a la loma de arriba, escuchó una ráfaga de detonaciones que se produjeron alrededor de 15 a 20 minutos después de las primeras dos detonaciones.[146]

El agente Pérez Rojas explicó que, una vez Bombero discutió, profirió palabras soeces y disparó, su ánimo bajó, ya que se encontraba tranquilo y conversando con personas aledañas a él.[147] Incluso, mencionó que Bombero se iba a montar en su vehículo para marcharse del lugar y ahí es que se escucha una ráfaga de tiros de más de 5 detonaciones.[148] En medio del caos, vio a la gente correr y gritar "mataron a alguien" "mataron al Bombero". Entonces, se enteró que asesinaron a Bombero.[149] Respecto a Wilson, manifestó

---

[140] *Id.* en las páginas 21-22.
[141] *Id.* en la página 23.
[142] *Id.* en las páginas 23-24.
[143] *Id.* en la página 24.
[144] *Id.* en las páginas 24-25.
[145] *Id.* en la página 25.
[146] *Id.* en la página 26.
[147] *Id.*
[148] *Id.* en las páginas 26-27.
[149] *Id.* en la página 28.

que, dada la situación, se despreocupó de él y supo al día siguiente que también había sido asesinado.[150] El fiscal Blondet Vissepó le preguntó al agente Pérez Rojas si logró ver a la persona que Bombero le arrojó la lata de cerveza, y este respondió que lo vio de espalada mientras corría.[151]

Después de presentarle el Exhibit 8 al agente Pérez Rojas, este identificó el sitio donde estaba con Wilson cuando lo sacó del local, además del sitio donde tuvo lugar el incidente con la lata de cerveza entre Bombero y la otra persona.[152] En la misma fotografía, señaló hacia donde corrió la persona que discutió con Bombero.[153] Al mostrarle el Exhibit 13, precisó que desde la lomita donde se encontraba podía observar perfectamente el portón.[154]

Prosiguiendo con su testimonio, el agente Pérez Rojas manifestó que estuvo en el negocio hasta las 5 o 6 de la mañana.[155] Explicó que llegó al caso porque se lo comentó a un agente del CIC y luego un agente de la División de Homicidios lo interrogó.[156] Así concluyó la fase del examen directo del agente Pérez Rojas.

Durante el contrainterrogatorio, el agente Pérez Rojas aceptó que suscribió una declaración jurada sobre los eventos que ha declarado ante el tribunal.[157] Tras revisar la declaración jurada, precisó que la proporcionó el 7 de septiembre de 2010.[158] Afirmó que mientras se encontraba en el pasillo de la parte de atrás del negocio, observó una discusión entre Jason y Wilson.[159] Respondió que luego de intervenir en la discusión, Jason salió del local por la entrada principal. Además, explicó que la última vez que vio a Jason fue

---

[150] *Id.*
[151] *Id.* en la página 29.
[152] *Id.* en las páginas 31-32.
[153] *Id.* en la página 32.
[154] *Id.* en la página 39.
[155] *Id.* en la página 40.
[156] *Id.* en la página 41.
[157] *Id.* en la página 48.
[158] *Id.* en la página 49.
[159] *Id.* en las páginas 53-54.

después del portón.[160] De igual forma, afirmó que Wilson le manifestó temerle solo a Jason.[161] También indicó que esa noche había "bastante gente".[162]

El agente Pérez Rojas asintió que no pudo identificar a la persona que Bombero le tiró la cerveza.[163] Detalló que perdió de vista a Jason cuando Bombero corrió hacia su carro.[164] Luego, aclaró que cuando Bombero corrió hacia su carro, ya Jason estaba detrás del portón.[165] También aseguró que, cuando Bombero habló de buscar su arma, no mencionó ningún nombre, simplemente se dirigió de esa manera.[166] Asimismo, afirmó conocer de vista a muchas de las personas que frecuentan el negocio.[167]

El agente Pérez Rojas afirmó que Bombero profirió palabras soeces tanto hacia una persona como hacia la misma dama que estuvo involucrada en la discusión entre Wilson y Jason.[168] Explicó que vio a Rodríguez González en el "bullicio de la gente" y que no lo vio en la parte de abajo del estacionamiento.[169] También indicó que no presenció al apelante junto a Bombero, Wilson o Jason.[170] Manifestó que él entendía que los disparos efectuados por Bombero no estaban dirigidos al joven mencionado ni a la mujer, sino al aire porque vio la mano de Bombero hacia arriba.[171]

El agente Pérez Rojas relató que desde que él se encontraba en el portón escuchando a Bombero proferir palabras soeces, hasta que corrió a la parte de arriba del negocio, pasaron alrededor de 15 a 20 minutos.[172] Indicó que cuando iba a entrar al negocio, sintió

---

[160] *Id.* en la página 57.
[161] *Id.* en la página 58.
[162] *Id.* en la página 59.
[163] *Id.* en la página 62.
[164] *Id.*
[165] *Id.*
[166] *Id.* en la página 66.
[167] *Id.* en la página 67.
[168] *Id.* en la página 73.
[169] *Id.* en la página 73.
[170] *Id.* en las páginas 73-74.
[171] *Id.* en la página 74.
[172] *Id.* en las páginas 76-77.

las ráfagas. Entonces, volvió a salir del local y "ya está el corre y corre".[173] Explicó que las personas que se encontraban dentro del establecimiento no podían bajar porque el portón estaba cerrado.[174] Indicó que llamó directamente al cuartel de la policía desde su celular.[175]

A preguntas del Ministerio Público, afirmó que no vio quien efectuó los disparos en la segunda ráfaga.[176] Explicó que cuando llegó a su trabajo a las 12:00 p.m. ya los agentes del CIC lo estaban esperando para entrevistarlo con relación a los hechos.[177] Mencionó que la primera persona que lo entrevistó fue el agente Manuel Caraballo.[178] Asintió que el día de los hechos, como agente del órden público, no intervino con Bombero por haber hecho uso del arma de fuego.[179] También afirmó que no vio a ninguna otra persona que no fuera Bombero con un arma en la mano. De la misma manera, sostuvo que pudo reconocer a Wilson, Jason, Bombero, una dama y una tercera persona cuya identidad desconoce, como las personas involucradas en los dos incidentes que presenció.[180]

La defensa del señor Rodríguez González solicitó que se admitiera la declaración jurada del agente Pérez Rojas, culminando así el contrainterrogatorio.

*Agte. Manuel Caraballo Vázquez*

El agente Caraballo Vázquez testificó que trabaja para la Policía de Puerto Rico en la División de Homicidios de Mayagüez.[181] Tras estipularse su capacidad como oficial de la policía, declaró que el 15 de agosto de 2010 estaba de servicio en la unidad de Homicidios. A las 3:40 de la madrugada, recibió una llamada y se le

---

[173] *Id.* en la página 77.
[174] *Id.* en la página 77.
[175] *Id.* en la página 79.
[176] *Id.* en la página 82.
[177] *Id.* en las páginas 83-84.
[178] *Id.* en la página 84.
[179] *Id.* en la página 88.
[180] *Id.*
[181] Véase la página 5 de la transcripción de la vista celebrada el 31 de mayo de 2023.

instruyó dirigirse al cuartel debido a la presencia de un herido de bala grave en el Centro Médico de Mayagüez.[182] Luego de recibir esa información, recogió su equipo en el cuartel y se dirigió hacia el Centro Médico de Mayagüez.[183] Expuso que llegó alrededor de las 4:00 y 4:40 de la mañana.[184]

Según declaró el agente Caraballo Vázquez, al llegar al área de emergencias del hospital, había varias patrullas y un vehículo custodiado por el agente Arvelo.[185] Detalló que allí también se encontraba el agente Camacho de servicios técnicos y el agente Padilla.[186] Sostuvo que pudo observar que en el vehículo había una persona muerta y que recibió información sobre otra persona herida de bala en el área de trauma.[187] Describió que el vehículo era marca Mazda, color verde, modelo DX, estilo "guagüita". Observó que ese vehículo tenía 3 perforaciones de bala en el área de la puerta del conductor.[188] Aludió que el cuerpo del occiso se encontraba arrinconado en el medio del vehículo y que tenía un impacto de bala en la mandíbula izquierda.[189] También notó otros impactos de bala en el área izquierda del cuerpo.[190]

El agente Caraballo Vázquez testificó que, habló con el agente Padilla y este le explicó que recibió una llamada por una persona herida de bala en el negocio Bumpers, localizado en la carretera número 100 en Cabo Rojo.[191] También señaló que, tanto el individuo herido de bala que estaba en el área de trauma, como la persona fallecida, provenían del mismo lugar.[192] Respondió que, de su investigación surgió que los dos occisos llegaron al hospital por

---

[182] *Id.* en la página 6.
[183] *Id.* en la página 7.
[184] *Id.* en las páginas 7-8.
[185] *Id.*
[186] *Id.* en la página 8.
[187] *Id.* en la página 9.
[188] *Id.*
[189] *Id.* en la página 10.
[190] *Id.* en la página 11.
[191] *Id.* en las páginas 11-12.
[192] *Id.* en la página 12.

separado.[193] Agregó que Wilson, quien estaba en el área de trauma, llegó primero a Centro Médico.[194] Declaró que el agente Padilla le comunicó que Wilson tenía un impacto de bala en el lado izquierdo del costado.[195] Asimismo, el agente Caraballo Vázquez especificó que no pudo observar a Wilson porque se encontraba en el área de trauma.[196] Posterior a ello, el doctor Román le informó que Wilson estaba delicado de salud ya que recibió una perforación sin salida en el costado izquierdo.[197] Entonces, continuó con la investigación del cuerpo sin vida, que resultó ser el señor José Méndez Ruiz, conocido como Bombero.[198] El agente Caraballo Vázquez declaró que, junto al agente Camacho tomaron fotografías del occiso Méndez Ruiz.[199] Señaló que el agente Padilla le informó que Wilson llegó al hospital en un Nissan Altima de color gris y le proporcionó la tablilla del vehículo. Además, le mencionó que la persona que llevó a Wilson al área de emergencias ya se había ido.[200]

El agente Caraballo Vázquez observó que, el vehículo de Bombero presentaba tres perforaciones en forma de triángulo en la puerta del conductor: dos al lado del cristal y otra abajo.[201] Detalló que por la forma de las perforaciones, pudo apreciar que los disparos venían de afuera hacia adentro del vehículo.[202] Relató que se movió el cadáver y tomó las medidas para hacer un croquis. Asimismo, describió que el cadáver tenía la mandíbula destruida y que el tiro entró por el lado izquierdo y salió por el lado derecho. Puntualizó que el cuerpo tenía cuatro perforaciones en el brazo izquierdo, una en el costado y una en el muslo izquierdo. Declaró que también observó un fragmento de bala en el asiento del pasajero, el cual se

---

[193] *Id.*
[194] *Id.* en la página 13.
[195] *Id.*
[196] *Id.*
[197] *Id.* en la página 14.
[198] *Id.* en las páginas 14-15.
[199] *Id.* en la página 15.
[200] *Id.*
[201] *Id.* en las páginas 16-17.
[202] *Id.* en la página 17.

fotografió y ocupó. Explicó que se fotografió el cadáver, se recogió el cuerpo y se llevaron el vehículo para acudir al lugar de la escena.[203]

El agente Caraballo Vázquez testificó que durante la investigación en el Centro Médico, se presentó la hermana del señor Méndez Ruiz, la señora Lisa Méndez, tras recibir una llamada en la que le informaron que a su hermano le dispararon. El agente especificó que, al ella recibir esa información, llegó al hospital y al rato llegó un hombre guiando el vehículo de su hermano.[204] Señaló que ella desconocía quién había manejado el vehículo, pero aun así pudo proporcionar una descripción de esa persona.[205] Durante la investigación, se determinó que esa persona era el señor Edgardo Méndez, residente del Residencial Candelaria.[206]

Más adelante, se le presentó el Exhibit 135, el cual el agente Caraballo Vázquez describió como el vehículo Mazda hallado en el área de emergencias.[207] Con relación a los Exhibits 131 y 114, detalló que reflejaban el cuerpo de Bombero.[208] De la misma manera, describió el contenido de los Exhibits 83-92, 101-109, 111-112 y el 129.[209] En cuanto los Exhibits 73 al 75, describió que mostraban el cuerpo del señor Sánchez González.[210] Sobre esto último, especificó que, recibió una llamada después de las 10:00 a.m. del 15 de agosto de 2010 donde se le informó que este había fallecido, por lo que tuvo que acudir a la morgue para fotografíar su cuerpo y capturar el impacto de bala que le causó la muerte.[211]

El agente Caraballo Vázquez declaró que en el Centro Médico también se presentó la señora Cuevas López, quien identificó a Bombero como su esposo.[212] Mencionó que le preguntó si estaba al

---

[203] *Id.*
[204] *Id.* en la página 19.
[205] *Id.* en las páginas 19-21.
[206] *Id.* en la página 22.
[207] *Id.* en la página 23.
[208] *Id.* en la página 25.
[209] *Id.* en las páginas 25-31.
[210] *Id.* en las páginas 31-33.
[211] *Id.* en la página 32.
[212] *Id.* en la página 34.

tanto de lo sucedido y ella respondió que todo había empezado por una pelea.[213] Asimismo, le indicó que Bombero había llegado al lugar con su amigo, Wilson.[214] Afirmó que ella se "aguantó, no quiso decir nada más", por lo que la citó para una entrevista posterior.[215]

El agente Caraballo Vázquez indicó que, una vez llegó al lugar de los hechos, la escena estaba custodiada por el agente De Jesús.[216] Declaró que entrevistó a un guardia de seguridad de nombre Luis, quien le mencionó que él no vio nada pero que hubo unas peleas por unas mujeres, que los tipos involucrados en las peleas eran de Candelaria y que el agente Pérez Rojas tuvo que intervenir.[217] Después de obtener esa información, el agente Caraballo Vázquez procedió a entrevistar al agente Pérez Rojas. Este le informó que los individuos eran de Candelaria.[218] Además, le relató que los empleados le mencionaron a Jason y a alguien llamado Prieto, señalando que este último tenía una "orden de arresto federal [...] y "que era un prófugo".[219]

El agente Caraballo Vázquez sostuvo que, luego recibió varias llamadas anónimas que mencionaban a las mismas personas, refiriéndose a quienes habían matado a Wilson y Bombero.[220] Agregó que, a través de esas llamadas, le dijeron que las personas eran de Candelaria, que fue por una pelea de mujeres y que estaban envueltos Jason, Wilson y Prieto. Aludió que esa información la obtuvo el 15 de agosto de 2010.[221]

El 17 de agosto de 2010, el agente Caraballo Vázquez investigó el número de la tablila del vehículo que dejó a Wilson en el Centro Médico de Mayagüez. Testificó que la información resultó ser del

---

[213] *Id.* en la página 34.
[214] *Id.* en la página 35.
[215] *Id.*
[216] *Id.* en la página 36.
[217] *Id.* en las páginas 40-41.
[218] *Id.* en la página 42.
[219] *Id.* en la página 43.
[220] *Id.* en la página 44.
[221] *Id.*

señor Diego Aldegor Vargas, por lo que procedió a entrevisarlo.[222] Este le indicó que él estaba en Bumper y que él se asustó porque Wilson se le montó en el carro estando herido. Por esta razón, lo llevó a Centro Médico y luego se marchó.[223] A preguntas del fiscal Blondet Vissepó, el agente Caraballo Vázquez declaró que se ocupó el vehículo del señor Aldegor Vargas. Agregó que en el asiento del pasajero "había un poquito" de sangre.[224] Especificó que el señor Aldegor Vargas le narró que él había llegado a Bumper como a las 2:00 a.m.[225] Además, le mencionó que el estacionamiento estaba lleno, por lo que él se quedó frente a la entrada llamando a su amigo.[226] En ese momento, él vio cuando una persona llegó hasta el carro que estaba a su lado y de forma agitada sacó un arma y comenzó a hacer unas detonaciones. El agente Caraballo Vázquez declaró que, según su investigación, esa persona resultó ser Bombero.[227]

Más adelante, el agente Caraballo Vázquez expuso que, el señor Aldegor Vargas le indicó que, tras asustarse, se estacionó donde vio un hueco, quedando frente al vehículo de Bombero.[228] Le manifestó que, luego vio una ráfaga de disparos y que de momento llegó un joven aguantándose el costado izquierdo y le abrió la puerta del pasajero y le pidió que lo llevara porque estaba herido.[229] El señor Aldegor Vargas también le comunicó al agente Caraballo Vázquez que le preguntó al joven su nombre, a lo que este respondió "Wilson" y le rogaba: "sálvame, sálvame, me duele".[230] Añadió que lo llevó al Centro Médico, lo dejó en el área de trauma y se marchó.[231]

---

[222] *Id.* en la página 46.
[223] *Id.* en las páginas 46-47.
[224] *Id.* en la página 47.
[225] *Id.* en la página 48.
[226] *Id.*
[227] *Id.* en la página 49.
[228] *Id.*
[229] *Id.* en la página 49-50.
[230] *Id.* en la página 50-51.
[231] *Id.* en la página 51.

El agente Caraballo Vázquez declaró que, el 17 de agosto de 2010, encontró en el terreno del estacionamiento 5 casquillos de calibre .40 y una bala sin disparar. El Ministerio Público le mostró el Exhibit 3 y el agente describió el área donde estaban los casquillos .40.[232]

Posteriormente, el agente Caraballo Vázquez indicó que, continuaba recibiendo información sobre el sospechoso y entonces fue al área de servicios técnicos de la PPR en Mayagüez. Allí pudo verificar la existencia de una orden de arresto en contra de una persona apodada Prieto, identificada como el señor Edgardo Rodríguez. También, mencionó que logró obtener la fotografía del ficheo. Acto seguido, lo identificó en la sala del tribunal.[233]

El agente Caraballo Vázquez indicó que, luego de ello, citó a la esposa de Bombero, la señora Yanitza Cuevas. Esta le indicó que el 14 de agosto de 2010 se encontraba en Bumper con una amiga apodada Lilly, quien es la esposa de Prieto.[234] Además, le relató que su esposo estaba con Wilson y que Prieto estaba con Jason.[235] Luego, le explicó que ocurrió una pelea entre Wilson y Jason debido a una mujer, y que Bombero se metió y "empezó a pelear allí con otro más".[236] También le expresó que cuando su esposo bajó al estacionamiento, se formó una pelea.[237] Entonces, ella se metió al baño de las mujeres, escuchó unas detonaciones, luego bajó y le informaron que mataron a su esposo.[238]

El 17 de agosto de 2010, el agente Caraballo Vázquez entrevistó al agente Pérez Rojas.[239] Este le indicó que mientras se encontraba en Bumper, consumiendo en el área de la barra, observó

---

[232] *Id.* en la página 55.
[233] *Id.* en la página 58.
[234] *Id.* en la página 59.
[235] *Id.* en las páginas 60-61.
[236] *Id.* en la página 61.
[237] *Id.* en la página 61.
[238] *Id.* en la página 62.
[239] *Id.* en la página 63.

a Jason discutir con una mujer.[240] En ese momento, llegó Wilson y le cuestionó a Jason. Acto seguido, Jason y Wilson tuvieron una discusión y comenzaron a pelear, pero él los separó.[241] Luego, le mencionó que le pidió a Wilson que se retirara del lugar, pero Wilson le respondió que le tenía miedo a Jason y le preguntó que si lo podía acompañar hasta afuera.[242] Asimismo, le indicó que Wilson andaba con Bombero ya que lo escuchó preguntar por él.[243] El agente Pérez Rojas le detalló al agente Caraballo Vázquez que, él observó a Jason alejarse con otra persona. Entonces, en ese momento, Bombero tuvo una discusión con la persona que andaba con Jason.[244] Precisamente, Bombero le tiró una lata de cerveza. Además, al agente Pérez Rojas le mencionó que Bombero manifestó que como esa persona iba a buscar armas, pues que él iba a buscar la suya.[245] Añadió que, le narró que la persona se fue por el estacionamiento de la parte de arriba y Bombero bajó la cuesta del negocio donde estaba su vehículo.[246] El agente Pérez Rojas también le dijo que bajó detrás de Bombero y cerró el portón porque supuso que podrían haber disparos.[247]

Como parte de la investigación, el agente Caraballo Vázquez explicó que Bombero disparó al aire y se disponía a montarse en su vehículo para retirarse del lugar, mientras que Wilson ya se había montado en el asiento del pasajero del vehículo de Bombero.[248] Declaró que en ese momento le dispararon a Bombero y que, después de resultar herido, una persona se llevó el vehículo.[249]

Tras un receso del tribunal, el agente Caraballo Vázquez declaró que, el 23 de agosto de 2010, nuevamente, entrevistó a la

---

[240] *Id.* en las páginas 63-64.
[241] *Id.* en la página 64.
[242] *Id.* en la página 65.
[243] *Id.*
[244] *Id.* en la página 66.
[245] *Id.* en la página 67.
[246] *Id.* en la página 68.
[247] *Id.* en la página 69.
[248] *Id.* en la página 70.
[249] *Id.* en la página 71.

esposa de Bombero. Esta le reiteró la misma pelea que le mencionó el agente Pérez Rojas, además que Jason estaba con Prieto.[250]

El agente Caraballo Vázquez continuó testificando que, el 1 de septiembre de 2010, llegó un joven detenido por la Unidad de Arrestos Especiales. Expresó que ese joven era el señor Santiago Rivera. Agregó que el señor Santiago Rivera le dijo que él había estado cuando ocurrió la muerte de dos personas en el negocio de Bumper.[251] Ante esto, el agente Caraballo Vázquez lo entrevistó.[252]

Como parte de la entrevista, el señor Santiago Rivera le narró que él estuvo en Bumper hasta las 3:00 a.m. con su esposa y unas amigas bebiendo y escuchando música.[253] Le relató que todo comenzó por una pelea relacionada con una mujer, y que este le dio los mismos nombres que le dieron el agente Pérez Rojas y la esposa de Bombero: Prieto, Jason, Bombero, y aunque no conocía bien a Wilson, también lo mencionó.[254] Según le manifestó Santiago Rivera, la primera pelea fue entre Jason y Wilson. Luego, le indicó que él escuchó una discusión entre Bombero y su esposa y que Bombero estaba bien agitado y que iba a matar al muchacho que estudiaba con ella.[255] Le aclaró que ese muchacho era Prieto, y que ahí comenzó una discusión entre Pietro y Bombero.[256]

El señor Santiago Rivera le explicó al agente Caraballo Vázquez que, Prieto y Bombero salieron del negocio. Entonces, Prieto y Jason se fueron hacia el estacionamiento de la parte de arriba.[257] También le contó que, Bombero bajó y él lo vio haciendo unos disparos como si fuera hacia donde se encontraban Jason y Prieto.[258] Además, este le manifestó que cuando ya Bombero se

---

[250] *Id.* en la página 78.
[251] *Id.* en las páginas 78-80.
[252] *Id.* en la página 80.
[253] *Id.*
[254] *Id.* en la página 81.
[255] *Id.* en las páginas 81-82.
[256] *Id.* en la página 82.
[257] *Id.* en la página 83.
[258] *Id.* en la página 85.

había calmado y se iba a montar en su vehículo, vio a Prieto entre los carros de la parte del estacionamiento de abajo.[259] Según le relató, Prieto sorprendió de frente a Bombero y le hizo un primer disparo en la cara.[260] Luego continuó disparándole.[261]

Después de relatar lo comunicado por el señor Santiago Rivera, el agente Caraballo Vázquez señaló que la versión proporcionada por Santiago Rivera guardaba una gran similitud con la ofrecida por el agente Pérez Rojas y la esposa de Bombero.[262]

Subsiguientemente, el agente Caraballo Vázquez testificó que, el señor Sanitago Rivera le proporcionó detalles sobre el arma utilizada por Prieto.[263] Específicamente, Santiago Rivera le dijo que era una pistola calibre 40 que había visto previamente, ya que Prieto se la mostró en otra ocasión debido a que se conocían de Candelaria y del negocio de los caballos.[264] El agente Caraballo Vázquez afirmó que, basándose en su investigación, el arma que se utilizó para causar la muerte de las dos personas fue un revólver de calibre .40.[265]

Posteriormente, el agente Caraballo Vázquez declaró que la primera entrevista con Santiago Rivera tuvo lugar el 1 de septiembre de 2010, y al día siguiente, el 2 de septiembre de 2010, lo acompañó a la fiscalía para tomarle una declaración jurada. A preguntas del Ministerio Público, sostuvo que él estuvo presente durante la toma de la declaración jurada.[266] Por otro lado, señaló que, el 9 de septiembre de 2010, se tomó la declaración jurada del resto de las personas entrevistadas como parte de la investigación.[267]

---

[259] *Id.*
[260] *Id.* en la página 85.
[261] *Id.* en la página 86.
[262] *Id.* en la página 87.
[263] *Id.* en la página 88.
[264] *Id.* en las páginas 88-89.
[265] *Id.* en la página 89.
[266] *Id.* en las páginas 89-90.
[267] *Id.* en la página 91.

A preguntas del fiscal Blondet Vissepó, el agente afirmó que la versión ofrecida por el señor Santiago Rivera durante el juicio fue consistente con lo expresado en su declaración jurada y en la vista preliminar.[268] Además, declaró que después de la comparecencia del señor Santiago Rivera en la vista preliminar, este recibió entre 14 y 15 puñaladas en la Cárcel El Limón, por lo que fue trasladado a la cárcel de Ponce.[269] Respecto a la señora Colón Carlo, mencionó que ella nunca se le acercó para conversar sobre el caso.[270]

El agente Caraballo Vázquez resaltó que, según su investigación, el señor Méndez no presenció el momento en que ocurrieron los disparos.[271] Sin embargo, el señor Méndez le comunicó que bajó al enterarse de que Bombero había sido herido. Luego, este le mencionó que él lo puso boca arriba, lo hecho a un lado, rompió un cristal, dio reversa y se lo llevó al Centro Médico de Mayagüez.[272]

El agente Caraballo Vázquez aludió que, luego de toda su investigación y la recreación de la escena, no tenía dudas de que la persona que asesinó a los señores Méndez Ruiz y Sánchez González fue el señor Rodríguez González.[273] Por otra parte, subrayó que del informe balístico resultó que la muerte de estas personas se produjo con un arma de calibre .40, tal como se detalla en los Exhibits 142 y 143.[274] Asimismo, el informe balístico reveló que los casquillos ocupados en el lugar eran del mismo plomo ocupado de los cuerpos de Wilson y Bombero.[275] De igual forma, resaltó que esos informes se elaboraron el 17 de febrero de 2011, y que el señor Santiago

---

[268] *Id.* en la página 96.
[269] *Id.* en las páginas 96-98.
[270] *Id.* en la página 100.
[271] *Id.* en la página 108.
[272] *Id.*
[273] *Id.* en la página 110.
[274] *Id.* en las páginas 111-112.
[275] *Id.* en la página 112.

Rivera ya le había proporcionado la información sobre el arma el 1 de septiembre de 2010.[276]

Después, el agente Caraballo Vázquez indicó que, el 9 de septiembre de 2010, Prieto fue arrestado por las autoridades federales y estatales.[277] Explicó que se dirigió al lugar y lo entrevistó. Sin embargo, este optó por ejercer su derecho a permanecer en silencio.[278] También mencionó que entrevistó a Jason, quien proporcionó una declaración jurada.[279] Destacó que Jason mencionó haber estado con Prieto cuando este inició una pelea con Wilson, la cual fue interrumpida por la intervención del agente Pérez Rojas, y que él huyó por el estacionamiento.[280] Jason también le comentó haber visto a Bombero con Prieto, pero se negó a dar más detalles.[281]

A preguntas del Ministerio Público, el agente Caraballo Vazquez expresó que llegó a la conclusión que quien le quitó la vida a Bombero y Wilson con un arma de fuego fue el señor Rodríguez González.[282]

Durante el contrainterrogatorio, el agente Caraballo Vázquez reconoció que tuvo que citar a todas las personas que entrevistó, ya que ninguna de ellas se presentó voluntariamente para proporcionar información.[283] Respecto al señor Aldegor Vargas, el agente Caraballo Vázquez asintió que esa persona en ningún momento fue o contactó a la policía.[284] Igualmente, el agente reconoció que el señor Aldegor Vargas no pudo identificar a ninguna persona como responsable de dispararle a Bombero.[285]

---

[276] *Id.* en la página 115.
[277] *Id.* en la página 116.
[278] *Id.* en la página 117.
[279] *Id.* en la página 118.
[280] *Id.* en las páginas 118-119.
[281] *Id.* en la página 119.
[282] *Id.* en la página 120.
[283] *Id.* en la página 123.
[284] *Id.* en la página 136.
[285] *Id.* en la página 160.

El agente Caraballo Vázquez admitió que, en la declaración jurada del señor Méndez, este mencionó que estuvo en el negocio hasta las 2:00 a.m. y que en ningún momento pudo observar alguna pelea, solo cuando le dijeron lo de Bombero y él bajó.[286] De igual manera, el agente respondió que el señor Méndez admitió en su declaración jurada que Bombero estaba vivo porque, al llevarlo al hospital, este hacía un quejido.[287]

Asimismo, el agente Caraballo Vázquez testificó que, el señor Santiago Rivera estaría mintiendo si dijo que, antes de prestar la declaración jurada, nunca habló con ningún agente del orden público, "porque él habló conmigo".[288] A preguntas de la Lcda. Vélez Torres, respondió que el señor Santiago Rivera nunca le pidió algo a cambio para declarar.[289] De igual modo, declaró que él no entrevistó a la esposa del señor Santiago Rivera, a Isabel y ni a Icu.[290]

Como parte del contrainterrogatorio, la defensa del señor Rodríguez González le solicitó al tribunal que tomara conocimiento judicial sobre el proceso de la Regla 185 de las de Procedimiento Criminal referente al caso número ISCI2006-1014. Particularizó que, en ese caso, fue el propio Ministerio Público quien solicitó la resentencia y se discutió la posibilidad de que el señor Santiago Rivera quedara en libertad el mismo día que testificó, resultando en una sentencia que se daría por cumplida.[291]

El agente Caraballo Vázquez admitió que, según su investigación, Jason fue la única persona que tuvo problemas con Wilson y reconoció que cuando lo entrevistó le realizó las advertencias de sospechosos.[292] También aceptó que, entre todos los

---

[286] *Id.* en la página 182.
[287] *Id.* en la página 181.
[288] *Id.* en las páginas 230-239.
[289] *Id.* en la página 263.
[290] Véase la página 18 de la transcripción de la vista celebrada el 12 de septiembre de 2013.
[291] *Id.* en las páginas 32, 33-46.
[292] *Id.* en la página 46.

testigos entrevistados que presenciaron los hechos, Brian Santiago fue el único que afirmó haber visto a Edgardo Rodríguez disparar.[293]

En el redirecto, el agente Caraballo Vázquez reafirmó que, según la versión de Santiago Rivera, la persona que vio disparando fue al señor Rodríguez González.[294] Agregó que el señor Santiago Rivera le mencionó que Jason estaba con Prieto esa noche. También testificó que, a pesar de haber sido apuñalado quince veces después de su testimonio en la vista preliminar, el señor Santiago Rivera compareció al juicio para declarar.[295]

El representante del Ministerio Público le preguntó al agente Caraballo Vázquez sobre la agresión que se le había ocasionado al testigo Brian Santiago después que declaró en vista preliminar.[296] Respecto a este hecho, la defensa contrainterrogó en su turno de recontrainterrogatorio y el agente aceptó que ese alegado incidente nunca fue investigado y no se radicó ningún tipo de querella.

Después de concluir el examen de recontrainterrogatorio, el Ministerio Público sometió el caso.

*Sra. Isabel Colón Carlo*

La señora Colón Carlo testificó que conoce a Brian Santiago Rivera porque era esposo de una amiga suya, la señora Marlene.[297] Aludió que lo conocía desde hace 5 o 6 años del residencial Kennedy.[298] Declaró que desconocía la fecha del incidente por el cual acusan al señor Rodríguez González.[299] Manifestó que acudió a testificar porque existen unos documentos con su nombre en los que el señor Santiago Rivera alegó que ella estuvo presente el día de los hechos.[300] Declaró que no es cierto que el día de los hechos ella llevó

---

[293] *Id.* en la página 50.
[294] *Id.* en la página 63.
[295] *Id.* en las páginas 64-65.
[296] *Id.* en la página 67.
[297] Véase las páginas 80-81 de la transcripción de la vista celebrada el 12 de septiembre de 2013.
[298] Id. en la página 81.
[299] *Id.*
[300] *Id.* en la página 82.

al señor Santiago Rivera al negocio Bumper.[301] Especificó, "es cierto que yo fui a ese sitio, pero es cierto que ese día que nosotros fuimos a ese sitio, allí, absolutamente no pasó nada".[302] Detalló que el lugar se llama Bumper y que ha ido una sola vez con "la que era mi cuñada, el esposo, Marlene, Brian, yo, y el que era mi esposo".[303] Relató que llegó al establecimiento entre 10:30 p.m. a 11:00 p.m. y se fueron del lugar como a la 1:00 a.m. o 1:30 a.m.[304] Agregó que las tres parejas se fueron del negocio a la misma vez.[305] Precisó que ella dejó a Marlene y a su esposo en Candelaria.[306]

La señora Colón Carlo sostuvo, que contrario a lo que alegó Brian, ella no estuvo en el lugar cuando asesinaron a Bombero. Aseguró no tener conocimiento del incidente en Bumper y afirmó que el día que ella estuvo allí, "no pasó absolutamente nada". Incluso, declaró que, como el ambiente estaba flojo, se fueron temprano.[307]

La testigo Colón Carlo mencionó que conocía al apelante como Prieto, pero enfatizó que no tenía ninguna relación con él.[308] Además, declaró que no fue obligada, coaccionada ni le habían ofrecido algo para testificar ese día.[309] A preguntas de la defensa del apelante, respondió que ni la policía ni el Ministerio Público la habían contactado para solicitar información.[310] Asimismo, señaló que Icu era su hermano y que en el momento de los hechos era menor de edad, por lo que no iba a esos negocios.[311]

Durante el contrainterrogatorio, el Ministerio Público le preguntó si en la declaración jurada del señor Santiago Rivera se

---

[301] *Id.* en la página 81.
[302] *Id.* en las páginas 83-84.
[303] *Id.* en la página 84.
[304] *Id.* en la página 84-85.
[305] *Id.* en la página 85.
[306] *Id.*
[307] *Id.* en la página 86.
[308] *Id.* en la página 88.
[309] *Id.* en las páginas 88-89.
[310] *Id.* en la página 89.
[311] *Id.* en las páginas 89-90.

hacía referencia a ella y esta indicó que sí.[312] Sin embargo, admitió que en la declaración no dice "Isabel Colón Carlo" ni "Isabel del Kennedy", sino "Isabel, la amiga de Marlene".[313]

Más adelante, el fiscal Blondet Vissepó le preguntó a la señora Colón Carlo si ella tenía hijos y esta mencionó que sí, que tenía tres.[314] Entonces, se le interrogó si sus hijos conocían al señor Rodríguez González, a lo que esta afirmó que sí.[315] Además, admitió que en ese momento su hijo de 16 años tenía casos pendientes relacionados con armas en el tribunal.[316] Se le cuestionó si su hijo le vendía armas al señor Rodríguez González, a lo que respondió: "no tengo entendimiento de eso".[317] Inmediatamente después, el fiscal le preguntó si tenía conocimiento de que su hijo vendía drogas para el apelante, a lo que la testigo respondió de la misma manera: "yo no tengo entendimiento de eso".[318]

La testigo Colón Carlo señaló que no podía recordar la fecha exacta en que había ido a Bumper y que solo lo había hecho una vez.[319] Resaltó que esa noche "no había mucha gente" y que la música "estaba media floja".[320] Agregó que la noche que ella acudió al negocio no vio al señor Rodríguez González.[321] A preguntas del Ministerio Público, respondió que ella no sabía si el señor Santiago Rivera y el señor Rodríguez González estaban en Bumper el 15 de agosto de 2010.[322] Por otro lado, afirmó que ella había visto en muchas ocasiones al agente Caraballo Vázquez, pero que nunca habló con él sobre el caso.[323]

---

[312] *Id.* en la página 91.
[313] *Id.* en la página 92.
[314] *Id.* en la página 93.
[315] *Id.*
[316] *Id.* en la página 94.
[317] *Id.* en la página 95.
[318] *Id.*
[319] *Id.* en la página 97.
[320] *Id.*
[321] *Id.* en las páginas 99-100.
[322] *Id.* en la página 102.
[323] *Id.* en las páginas 103-104.

En el examen redirecto, la señora Colón Carlo reafirmó su visita al establecimiento Bumper. Respondió que, el señor Santiago Rivera la acompañó junto a otras personas, y que todos regresaron juntos.[324] Además, reafirmó que ese día no ocurrió nada inesperado. Finalmente, la señora Colón Carlo afirmó que ningún agente del orden público ni ningún fiscal se acercó a ella para preguntarle si tenía información sobre los hechos.[325]

**-II-**

**-A-**

En nuestro ordenamiento jurídico la determinación sobre si se demostró la culpabilidad de un acusado o una acusada más allá de duda razonable es revisable en apelación, debido a que la apreciación de la prueba desfilada en un juicio es un asunto tanto de hecho como de derecho. *Pueblo v. Irizarry Irizarry*, 156 DPR 780, 788 (2002). Como regla general, los foros superiores no poseemos facultad para sustituir las determinaciones del tribunal de primera instancia con nuestras propias apreciaciones. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013); *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007). Por consiguiente, tampoco debemos intervenir con las determinaciones de hechos que realizó ese foro, la apreciación de la prueba y la adjudicación de credibilidad de los testigos. *Id.*

En el ámbito jurídico penal, es un principio fundamental que, al revisar cuestiones relativas a convicciones criminales, la apreciación de la prueba le corresponde, en primera instancia, al foro sentenciador. *Pueblo v. Santiago et al.*, 176 DPR 133, 148 (2009). Esto se debe a que, "el foro apelativo cuenta solamente con

---

[324] *Id.* en la página 107.
[325] *Id.* en la página 110.

récords mudos e inexpresivos". *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 356 (2009). Tal deferencia se fundamenta en que:

> [E]s el juez sentenciador, ante quien deponen los testigos, quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad. *Pueblo v. García Colón I*, 182 DPR 129, 165 (2011).

Por lo tanto, "[a]l evaluar si se probó la culpabilidad de un acusado más allá de duda razonable, los foros apelativos no debemos de hacer abstracción de la ineludible realidad de que los jueces de primera instancia y los jurados están en mejor posición de apreciar y aquilatar la prueba y los testimonios presentados". *Pueblo v. Casillas, Torres*, 190 DPR 398, 416 (2014); *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000).

Por otra parte, en cuanto a la prueba presentada en el juicio, la Regla 110 de las Reglas de Evidencia provee lo siguiente:

> La juzgadora o el juzgador de hechos deberá evaluar la evidencia presentada con el propósito de determinar cuáles hechos han quedado establecidos o demostrados, con sujeción a los principios siguientes:
>
> [...]
>
> (c) Para establecer un hecho, no se exige aquel grado de prueba que, excluyendo la posibilidad de error, produzca absoluta certeza.
>
> (d) La evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley.
>
> [...]
>
> 32 LPRA Ap. VI, R. 110.

A la luz de lo expuesto previamente, las Reglas de Evidencia establecen que para probar un hecho no se requiere un nivel de prueba que garantice una certeza absoluta. Además, un testimonio al que se le otorgó entero crédito por el juzgador o la juzgadora, es prueba suficiente para demostrar cualquier hecho. **Esto es así, aunque no se trate del testimonio "perfecto" o libre de**

**contradicciones.** *Pueblo v. Santiago et al., supra,* pág. 147, *Pueblo v. Chévere Heredia,* 139 DPR 1, 15-16 (1995). (Énfasis nuestro). Por eso, las contradicciones en el testimonio de un o una testigo, ya sean intrínsecas o relacionadas con otros testimonios, no necesariamente resultan en la anulación de una sentencia condenatoria, a menos que produzcan en el foro apelativo una "insatisfacción o intranquilidad de conciencia tal", que estremezca su sentido básico de justicia. *Pueblo v. Rivero, Lugo y Almodóvar,* 121 DPR 454, 474 (1988).

La norma de deferencia discutida anteriormente encuentra su excepción, y la sentencia de culpabilidad debe ser revocada si se demuestra que hubo pasión, prejuicio, parcialidad o error manifiesto en la evaluación de la prueba realizada por el juzgador de los hechos, cuando un análisis integral de la prueba así lo justifique o cuando la prueba no concuerde con la realidad fáctica, sea increíble o imposible. *Pueblo v. Casillas, Torres, supra,* pág. 417; *Pueblo v. Santiago et al., supra,* pág. 148. Cabe señalar, que "el marco de acción limitado, a nivel apelativo, con respecto a la apreciación de la prueba, no implica que el foro recurrido sea inmune a error; tampoco que, so color de la deferencia […], haremos caso omiso a los errores que se hayan cometido en el foro de instancia". *Pueblo v. Acevedo Estrada,* 150 DPR 84, 100 (2000). De manera, que "[e]ste Tribunal revocará un fallo inculpatorio cuando el resultado de ese análisis deje serias dudas, razonables y fundadas, sobre la culpabilidad del acusado". *Pueblo v. Santiago et al., supra,* pág. 148.

**-B-**

La presunción de inocencia es un principio cardinal y un derecho fundamental en nuestro ordenamiento jurídico penal que cobija a toda persona acusada de delito. Art. II, § 11, Const. ELA, LPRA, Tomo 1; *Pueblo v. Casillas, Torres, supra,* pág. 413; *Pueblo v.*

*Rodríguez Pagán*, 182 DPR 239, 258 (2011). Esta exigencia probatoria es consustancial a las garantías constitucionales que impiden al Estado privar a alguien de sus intereses propietarios y libertarios sin un debido proceso de ley, y que requieren que la culpabilidad de cualquier persona acusada de un delito se pruebe más allá de duda razonable. *Id.* En ese sentido, para que una determinación de culpabilidad se sostenga, le corresponde al Estado presentar, a lo largo de todas las etapas del proceso en el nivel de instancia, prueba suficiente en derecho. *Pueblo v. Rodríguez Pagán, supra*, pág. 258.

Por imperativo constitucional, el Ministerio Público deberá controvertir la presunción de inocencia de la persona acusada presentando prueba más allá de duda razonable relativa "a cada uno de los elementos del delito, su conexión con el acusado y la intención o negligencia criminal de este". *Pueblo v. Santiago et al.*, *supra*, pág. 142. De existir duda razonable en cuanto a la culpabilidad de la persona acusada, el juzgador o la juzgadora deberá absolverlo. Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110. No obstante, este estándar probatorio no implica que el Ministerio Público tiene que presentar prueba dirigida a establecer con certeza matemática la culpabilidad de la persona acusada. *Pueblo v. Casillas, Torres, supra*, pág. 414. Por el contrario, "[l]o que se requiere es prueba suficiente que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". *Id.*, págs. 414–415.

En lo que respecta al *quantum* de prueba exigible, el Tribunal Supremo de Puerto Rico ha expresado que:

> [L]a duda que acarrea la absolución del acusado no es una duda especulativa o imaginaria, ni cualquier duda posible. Más bien, es aquella duda producto de una consideración justa, imparcial y serena de la totalidad de la evidencia del caso. En síntesis, existe duda razonable cuando el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad con la prueba de cargo presentada. En

atención a ese principio, los foros apelativos deben tener la misma tranquilidad al evaluar la prueba en su totalidad. *Íd.*, pág. 415 (citas omitidas).

En ese contexto, la función de los foros apelativos consiste en determinar si la prueba creída por el juzgador o la juzgadora sostiene que la persona acusada cometió el delito que se le imputa más allá de duda razonable. *Pueblo v. Santiago et al., supra*, pág. 142.

**-C-**

El Artículo 106 del Código Penal de 2004 de Puerto Rico, 33 LPRA § 5142, tipifica el delito de asesinato en primer grado como "[t]odo asesinato perpetrado por medio de veneno, acecho o tortura, o con premeditación". Por lo tanto, para que se configure este delito, es necesario el cumplimiento de los siguientes requisitos genéricos: (1) dar muerte a un ser humano y (2) consumar el acto con malicia premeditada. *Pueblo v. Negrón Ayala*, 171 DPR 406, 418 (2007); *Pueblo v. Colón Soto*, 109 DPR 545, 549 (1980); *Pueblo v. Méndez*, 74 DPR 913, 925-926 (1953).

Este delito requiere el elemento de deliberación y la intención específica de matar, pues "[e]l asesinato es un delito que, por su definición y naturaleza, conlleva un acto perverso, malintencionado y contrario a los valores éticos y morales de nuestra sociedad". *Pueblo v. Rodríguez Vicente*, 173 DPR 292, 300 (2008); *Pueblo v. Negrón Ayala, supra*, págs. 418-419. La malicia premeditada "es el elemento mental requerido en el delito de asesinato", ello "implica la ausencia de justa causa o excusa y conciencia al ocasionar la muerte de un semejante". *Pueblo v. Rodríguez Vicente, supra*, pág. 301; *Pueblo v. Negrón Ayala, supra*, pág. 419. A esos efectos, el Tribunal Supremo de Puerto Rico ha dispuesto que: "tanto la deliberación como la malicia son elementos subjetivos cuya existencia, en la mayoría de los casos, solo podrá ser determinada mediante una inferencia razonable de los hechos". *Id.* Dichos

elementos subjetivos "pueden deducirse a base de los actos y las circunstancias que rodearon la muerte; la relación entre las partes; la capacidad mental, motivación, manifestaciones y conducta del acusado; así como de los hechos anteriores, concomitantes y posteriores al crimen". *Pueblo v. Negrón Ayala, supra*, pág. 420.

**-D-**

La Ley Núm. 404-2000, conocida como la Ley de Armas de Puerto Rico, 25 LPRA ant. § 455–460k, según enmendada, se aprobó "con el propósito principal de lograr una solución efectiva al problema del control de armas de fuego en manos de delincuentes en Puerto Rico". *Pueblo v. Concepción Guerra*, 194 DPR 291, 310 (2015); Exposición de Motivos de la Ley Núm. 404-2000, *supra*. La Ley de Armas, *supra*, establece como delito la portación y el uso de un arma de fuego sin licencia. En concreto, el Artículo 5.04 dispone que incurre en delito grave y será convicta:

> [t]oda persona que transporte cualquier arma de fuego o parte de esta, sin tener una licencia de armas, o porte cualquier arma de fuego sin tener su correspondiente permiso para portar armas[.]
>
> [...]
>
> Se considerará como "agravante" cualquier situación en la que el arma ilegal se utilice en la comisión de cualquier delito o su tentativa.
>
> 25 LPRA § 458c.

En relación a este tema específico, el Tribunal Supremo de Puerto Rico ha expresado que "el delito de portación ilegal conlleva, como elemento esencial e imprescindible, una ausencia de autorización para la correspondiente portación del arma". *Pueblo v. Negrón Nazario*, 191 DPR 720, 752 (2014). Por "transportar" se entiende:

> La posesión mediata o inmediata de un arma, con el fin de trasladarla de un lugar a otro. Dicha transportación deberá realizarse por una persona con licencia de armas vigente, y el arma deberá estar descargada y ser transportada dentro de un estuche cerrado que no

refleje su contenido, y el cual a su vez no podrá estar a simple vista. 25 LPRA § 455 (x).

Sin embargo, la "portación" se refiere a "la posesión inmediata o la tenencia física de un arma, cargada o descargada, sobre la persona del portador, entendiéndose también cuando no se esté transportando un arma de conformidad a como se dispone en este capítulo". 25 LPRA ant. § 455 (s). La mera portación ilegal de un arma de fuego es un delito en sí, su "consumación no depende del uso que se le brinde al arma". *Pueblo v. Negrón Nazario, supra*, pág. 753. Por tanto, "una persona podría incurrir en el delito de portación ilegal sin necesidad de utilizar el arma". *Id.* El uso del arma de fuego no es un elemento para que se configure el delito de portación ilegal. *Id.*, pág. 754.

Por otro lado, el Artículo 5.15 de la Ley de Armas, *supra*, establece en lo pertinente que:

> (A) Incurrirá en delito grave toda persona que, salvo en casos de defensa propia o de terceros o de actuaciones en el desempeño de funciones oficiales o de actividades legítimas de deportes, incluida la caza, o del ejercicio de la práctica de tiro en un club de tiro autorizado:
>
> > (1) voluntariamente dispare cualquier arma en un sitio público o en cualquier otro sitio, aunque no le cause daño a persona alguna, o
> >
> > (2) intencionalmente, aunque sin malicia, apunte hacia alguna persona con un arma, aunque no le cause daño a persona alguna [...]
>
> [...]
>
> 25 LPRA ant. § 458n.

### -III-

Tomando en cuenta la normativa antes expuesta, evaluamos los errores planteados en el caso ante nuestra consideración. Por estar relacionados a la suficiencia y apreciación de la prueba, discutimos conjuntamente los dos señalamientos de error.

En el primer señalamiento de error, el señor González Rodríguez planteó que el Ministerio Público no logró derrotar la presunción de inocencia ni demostrar todos los elementos de los

delitos imputados más allá de duda razonable. Como segundo error, el apelante sostuvo que el foro primario no consideró las evidentes contradicciones en el testimonio y la clara motivación del único testigo de cargo, Brian Santiago Rivera, quien vincula al señor Rodríguez González con las acusaciones presentadas.

De acuerdo con la postura del apelante, la identificación del señor Rodríguez González y su implicación en los eventos del 15 de agosto de 2010 se basaron únicamente en el testimonio de un solo testigo, el señor Brian Santiago Rivera. Además, argumenta que la evidencia presentada por el Ministerio Público estuvo plasmada de notables contradicciones e inconsistencias en el testimonio de este testigo. También sostiene que, en contraste con otros testimonios y la investigación llevada a cabo por los funcionarios del orden público, el testimonio del señor Santiago Rivera carece de credibilidad, por lo que no debería servir como base para una convicción o identificación definitiva. Sin embargo, no le asiste la razón.

En la jurisprudencia se ha establecido que las contradicciones en las declaraciones de un o una testigo no necesariamente disminuyen su valor probatorio ni conllevan la revocación de un fallo condenatorio. En este caso, las contradicciones en las declaraciones del señor Santiago Rivera no condujeron al tribunal a descartar por completo su testimonio. Entendemos la valoración del foro primario, ya que las contradicciones no tienen el efecto que el apelante pretende atribuirles.

En primer lugar, el señor Rodríguez González destaca que el señor Santiago Rivera mintió sobre cómo se entrevistó con los agentes del orden público y con fiscalía. En esencia, argumenta que el señor Santiago Rivera declaró que la primera vez que habló sobre lo sucedido en Bumper fue el 2 de septiembre de 2010, cuando prestó declaración jurada. Además, plantea que el señor Santiago

Rivera testificó que no le contó a nadie más sobre esos eventos y que compareció a fiscalía de Mayagüez sin ser citado para ofrecer una declaración jurada sobre lo ocurrido. El señor González Rodríguez sostiene que al contrastar la versión del señor Santiago Rivera con lo declarado por el agente Caraballo Vázquez, se evidenció que esto era falso, ya que desde el 1 de septiembre de 2010 el agente lo había entrevistado y citado a comparecer a fiscalía al día siguiente.

Con relación a lo anterior, el hecho de que exista una discrepancia sobre la forma en que llegó el señor Santiago Rivera a la fiscalía de Mayagüez para prestar declaración jurada no invalida su testimonio, ya que no se trata de un aspecto sustancial sobre el doble asesinato que presenció.

El señor Rodríguez González también resalta que el señor Santiago Rivera mintió sobre haber llegado al negocio la noche del 14 de agosto de 2010 en compañía de su pareja y amistades. Además, sostiene que mintió al indicar que su pareja y sus amigos se marcharon antes y él se quedó, lo que le permitió estar presente durante los sucesos. Para respaldar su punto, el apelante afirma que, al ser confrontado con su declaración jurada, el señor Santiago Rivera tuvo que admitir que en ese documento afirmaba algo diferente bajo juramento, sin lograr aclarar dónde mentía, si en el juicio o en el documento escrito. Asimismo, el señor Rodríguez González argumenta que surgió claramente del testimonio del agente Caraballo Vázquez que el señor Santiago Rivera le había manifestado a este que el día de los hechos él se encontraba en el negocio con su esposa y unas amistades, y que después de los disparos, se marchó de allí con las mismas personas con las que había llegado. Sobre este asunto, el apelante añade que la testigo de defensa, la señora Isabel Colón Carlo, declaró que el señor Santiago Rivera había llegado a Bumper esa noche del 14 de agosto con ella y otras personas más, y que todos se habían marchado juntos entre

la 1:00 y 1:30 de la madrugada, sin que allí hubiere ocurrido ningún incidente. El señor Rodríguez González también expone que el testimonio de la señora Colón Carlo fue descartado por el foro primario, pero que merecía total credibilidad al no ser motivado por un beneficio personal y no ser impugnado de ninguna forma.

En relación con los argumentos previos, es crucial resaltar que la discrepancia entre la declaración jurada y los testimonios presentados en el juicio sobre si el señor Santiago Rivera se fue con las mismas personas con las que llegó o si estas se marcharon antes que él no es suficiente para desacreditar su testimonio ni para generar una duda razonable sobre la culpabilidad del apelante. **Esto cobra especial relevancia debido al testimonio de la testigo de la defensa, la señora Colón Carlo, quien afirmó desconocer la fecha del incidente por el cual acusan al señor Rodríguez González y no pudo recordar la fecha exacta en que había ido a Bumper. La señora Colón Carlo simplemente se limitó a responder que había acudido al negocio una sola vez en compañía del señor Santiago Rivera y otras personas.**[326] Por consiguiente, comprendemos la posición del foro primario en descartar el testimonio de la señora Colón Carlo.

Por otra parte, el señor Rodríguez González expone que, al comparar los testimonios del agente Pérez Rojas y el testigo Santiago Rivera, se pueden notar diferencias significativas. En esencia, el apelante asegura que no hay duda en que el agente describió con detalles lo que presenció aquel 14 y 15 de agosto en el negocio Bumper. Además, destaca que el agente declaró sobre los mismos incidentes que alegó el señor Santiago Rivera, y de una forma mucho más convincente describió los incidentes entre Wilson y Jayson, y Bombero y una persona no identificada. Asimismo, indica que el

---

[326] Véase las páginas 81, 97 y 102 de la transcripción de la vista celebrada el 12 de septiembre de 2013.

agente Pérez Rojas conocía a Wilson, Jayson, Bombero y a Prieto, y éste en ningún momento, a diferencia del señor Santiago Rivera, lo ubicó cerca de Bombero o de Jayson y mucho menos con un arma en su mano disparando. El apelante argumenta que la única persona que alega haber presenciado un altercado entre Bombero y Prieto, o un disparo por parte de este último, fue el señor Santiago Rivera, un testigo cuya declaración, según el apelante, estuvo evidentemente influenciada por el beneficio que podría obtener de ver su sentencia de reclusión cumplida.

En relación con lo anterior, es cierto que el agente Pérez Rojas no observó quién estuvo involucrado en el altercado con Bombero ni quién realizó los disparos, ya que estaba de espaldas a esa persona cuando se produjo tanto el segundo altercado como la ráfaga de disparos. Sin embargo, el testigo Brian Santiago Rivera sí presenció la mencionada discusión entre Bombero y Prieto, así como también el momento en que el apelante les disparó a los occisos frente al vehículo de Bombero.

Por ultimo, el señor Rodríguez González argumenta que, a pesar de que hubo varias personas entrevistadas sobre el incidente en el negocio, ninguna persona señaló o identificó al señor Rodríguez González como el individuo que disparó a las víctimas. No obstante, es crucial resaltar que el señor Santiago Rivera sí lo identificó. Como hemos mencionado previamente, las reglas de evidencia establecen que el testimonio directo de un o una testigo, si es creíble, constituye prueba suficiente para demostrar cualquier hecho.

Como se detalla en la sección II de esta Sentencia, al revisar convicciones criminales, la apreciación de la prueba le corresponde, en primera instancia, al foro sentenciador. La prueba presentada por el Ministerio Público fue amplia y mereció la credibilidad del foro de primera instancia. En esencia, concluimos que el testimonio del señor Santiago Rivera se mantuvo consistente en lo que es

realmente fundamental: que el apelante cometió los asesinatos de Bombero y Wilson al dispararles con un arma de fuego calibre .40. Además, su testimonio fue respaldado por la declaración del agente Pérez Rojas y la minuciosa investigación realizada por el agente Caraballo Vázquez. Por lo tanto, la evidencia presentada derrotó la presunción de inocencia que cobijaba al apelante y demostró su culpabilidad más allá de duda razonable. En ausencia de prejuicio, parcialidad o error manifiesto por parte de dicho foro, sostenemos la Sentencia apelada al concluir que no se cometieron los errores señalados.

**-IV-**

Por los fundamentos antes expuestos, se confirman las Sentencias apeladas.

Lo acuerda el Tribunal, y lo certifica la Secretaría del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones
